**SIERRA CLUB, a non-profit corporation; the Wilderness Society, a non-profit corporation; and Texas Committee on Natural Resources, a non-profit trust, Plaintiffs,**

**v.**

**Richard E. LYNG, in his official capacity as Secretary of Agriculture; F. Dale Robertson, in his official capacity as Chief Forester of the United States Forest Service, Department of Agriculture; John E. Alcock, in his official capacity as Regional Forester, Region 8 of the United States Forest Service; William M. Lannan, in his official capacity as United States Forest Supervisor of Texas National Forests, Defendants.**

Civ. A. No. L–85–69–CA.

United States District Court,
E.D. Texas,
Lufkin Division.

June 17, 1988.

Doug L. Honnold, Boulder, Colo., for plaintiffs Sierra Club & Wilderness Society.

Edward C. Fritz, Dallas, Tex., for plaintiff Texas Committee on Natural Resources.

Ruth Harris Yeager, Asst. U.S. Atty., Tyler, Tex., Charles Brooks, and Wells D. Burgess, U.S. Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

ROBERT M. PARKER, District Judge.

Before the Court is the Motion of the Plaintiff Sierra Club and Wilderness Society (hereinafter Sierra Club) for Injunctive Relief to restrain certain timber management activities of the United States Forest Service (hereinafter Forest Service). Plaintiffs allege that these management practices have an adverse impact upon the red-cockaded woodpecker, an endangered species living within the national forests in the State of Texas. The Court held a trial and evidentiary hearing on the Plaintiffs' motion on February 29, 1988 through March 3, 1988. Fed.R.Civ.P. 65(a)(2). The parties submitted post-trial briefs and further oral argument was conducted on these matters on April 15, 1988. In the latest round of argument and briefing, the Plaintiff Texas Committee on Natural Resources (hereinafter TCONR) submitted a "Motion for Summary Judgment as to Longleaf Ridge,"

however the Court concludes that this matter should be stayed as addressed below.

The Plaintiffs allege a number of different causes of action, as follows: first, the Plaintiffs claim that certain activities of the Defendants constitute a "taking" of the red-cockaded woodpecker (hereinafter RCW or woodpecker) within the meaning of Section 9 of the Endangered Species Act, 16 U.S.C.A. § 1538(a)(1)(B) (West 1985). Additionally, allegations are made that the Defendants have violated Section 7 of the Endangered Species Act (ESA), 16 U.S.C.A. § 1536(a)(2) (West 1985), by "jeopardizing" the woodpecker within the meaning of 50 C.F.R. § 402.02, and by failing to reinitiate consultation with the U.S. Fish and Wildlife Service in light of new information affecting the woodpecker, pursuant to 50 C.F.R. § 402.16(b) (1987).

Second, the Plaintiffs contend that the actions of the Forest Service to control southern pine beetles (hereinafter the SPB Program or Beetle Program) are in violation of the Wilderness Act, 16 U.S.C.A. §§ 1131–1136 (West 1985). Third, the Plaintiffs assert that the administrative denial of a stay to halt implementation of the Land and Resource Management Plan for the Texas national forests (LRMP or Forest Plan), promulgated pursuant to the National Forest Management Act (NFMA), 16 U.S.C.A. § 1604, et seq. (West 1985), was in violation of the Administrative Procedure Act (APA), 5 U.S.C.A. § 706(2)(A) (West 1985).

The Fourth claim of the Plaintiffs relates to an administrative dismissal of a claim to designate part of the Angelina National Forest as a wilderness area, referred to in the pleadings as the "Longleaf Ridge" area. However, on May 9, 1988, the Forest Service issued a directive preventing further timber sales in the Longleaf Ridge area until such time as the Forest Plan administrative appeal is decided. Accordingly, although this claim was originally advanced by the Plaintiffs in pleadings and during the trial, it will not be addressed here since the claim is now STAYED, as requested by the Defendants.

In the fifth and final claim advanced at trial, the Plaintiffs contend that the southern pine beetle Environmental Impact Statement (hereinafter the SPB EIS or Beetle EIS) promulgated in conjunction with the Beetle Program is deficient and otherwise violates the National Environmental Policy Act (NEPA) 42 U.S.C.A. § 4321, *et seq.* (West 1985). The Plaintiff Sierra Club and the Forest Service agreed on the record, over the objections of TCONR, that this issue is not yet ripe. The Court agrees with the Sierra Club and the Forest Service, therefore the claims surrounding the sufficiency of the Beetle Program and the SPB EIS will not be addressed in this opinion.

After considering the oral arguments presented, the briefs submitted, and evidence adduced at the trial, the Court concludes that the following order is appropriate. The Court hereby finds and holds that the conduct of the Forest Service has detrimentally impacted upon the red-cockaded woodpecker in violation of the Endangered Species Act and the applicable regulations, and thereby constitutes a "taking" of the species within the meaning of Section 9 of the Endangered Species Act. The Court further finds that actions of the Forest Service have jeopardized the woodpecker within the meaning of Section 7 of the Endangered Species Act. Since the Forest Service's management practices are tantamount to a taking of the endangered species, the Court is of the opinion that the remedies described in this order must be instituted to protect the red-cockaded woodpecker from extinction in Texas. The remaining claims of the Plaintiffs under the Wilderness Act and relating to a denial of a stay are without merit for the reasons described below.

## PROCEDURAL HISTORY

The subject matter of this suit, the management of the national forests in Texas,[1] has been litigated in this circuit on several previous occasions. The red-cockaded woodpecker was a background character in previous suits, since he was not in the spotlight as he is in the present action. In *Texas Committee on Natural Resources v. Bergland,* 573 F.2d 201 (5th Cir.1978), *cert. denied,* 439 U.S. 966, 99 S.Ct. 455, 58 L.Ed.2d 425 (1978), the Fifth Circuit Court of Appeals addressed several issues relating to the Forest Service's practice of clear-cutting, shelterwood cutting, and seed-tree cutting, all of which are also known as even-aged management.[2] In *Bergland,* the Fifth Circuit dissolved an injunction entered by the district court which had held that the EIS relating to the practice of even-aged management was insufficient and in violation of NEPA. *Texas Committee on Natural Resources v. Bergland,* 573 F.2d at 212. Other causes of action presented were not addressed by the district court at the trial level.

The Fifth Circuit ultimately held that it was improper for the district court to enjoin the Forest Service management practices under NEPA until such time as the agency implemented a "Forest Plan" in accordance with NFMA. NFMA was passed in 1976, and at the time the *Bergland* court ruled, it was anticipated that a Forest Plan would be in place within sever-

---

1. The national forests in East Texas include the Sam Houston National Forest, the Angelina National Forest, the Davy Crockett National Forest, and the Sabine National Forest.

2. The term even-aged management includes "clear-cutting" where all the trees are cut down, "seed-tree cutting" where most trees are cut down except for some trees that are left to naturally seed an area, and "shelterwood" cutting where about double the number of trees (compared to a seed-tree cut) are left standing. The density of a shelterwood forest is fairly low with only about 16 trees per acre. In seed-tree cuts, the older trees used for germination purposes are later removed.

Currently, one hundred percent (100%) of the timber base of the national forests in Texas, or eighty two percent (82%) of the entire forest is under even-aged management. Final Environmental Impact Statement, Land and Resource Management Plan, National Forests and Grasslands—Texas (1987) (Forest Plan EIS), pp. III–14 to III–16; Final Land and Resource Management Plan—National Forests and Grasslands—Texas (1987) (Forest Plan), pp. J–2, J–3. Uneven-aged management or selection management, in contrast, consists of selecting of individual particular trees in a given area for cutting. In layman's terms, selection management techniques may be analogized to "thinning" the forests for timber harvest, rather than cutting all or most of the forest down.

al years, and would then be subject to judicial scrutiny. In actuality, the final version of the Forest Plan was not issued until the April 6, 1987 Record of Decision (ROD) of the Forest Service, about a decade later.

The instant action was instituted in 1985. Shortly after the suit was filed, this Court entertained a motion by the Plaintiffs for a preliminary injunction. The thrust of the claim asserted again related to violations of NEPA—but this time the challenge was made to the Forest Service's Beetle Program and the accompanying Beetle EIS, rather than the overall forest management plan. *Sierra Club v. Block*, 614 F.Supp. 134 (E.D.Tex.1985). The Court ruled that it was unwilling to grant the Plaintiffs the full relief requested under their NEPA claim, but did rule that certain practices of the Forest Service warranted court imposed restrictions to prevent harm to the endangered red-cockaded woodpecker until the time of trial. *Sierra Club v. Block*, 614 F.Supp. at 139–141.

In that order, the Court found that the Forest Service had been violating their own regulations to protect the woodpecker while combatting the southern pine beetles. The Court directed the following: 1) the cutting of hardwood trees unaffected by pine beetles should cease, 2) cutting should take place only where necessary to protect woodpecker colonies or spread of the beetles to private lands, 3) pine trees that are cut should be felled toward infested areas rather than away from them, 4) natural boundaries should be used as buffer zones, 5) discretion could be exercised in cutting, but only if minimally sufficient steps were taken to control the Beetles in the wilderness areas, and 6) the Forest Service should follow its own guidelines, as well as provide the Plaintiffs with information about each cut. *Sierra Club v. Block*, 614 F.Supp. at 140–141.

On October 22, 1987, the Plaintiff Texas Committee on Natural Resources moved for a Temporary Restraining Order. TCONR contended that all even-aged management practices should be halted because they violated the Wilderness Act and the Endangered Species Act, in addition to NEPA. This Court held a hearing on the motion for a Temporary Restraining Order and a Preliminary Injunction, holding in the Order of October 26, 1987, that the broad based relief sought by the Plaintiffs to suspend all even-aged management in all of the national forests of Texas, was unwarranted. The Court denied the motion, refused to lift the six (6) restrictions imposed in 1985, and further ordered that cutting within one hundred (100) yards of the red-cockaded woodpecker colonies be prohibited until a full evidentiary hearing and trial could be held. *Sierra Club v. Block*, 694 F.Supp. 1255 (E.D.Tex.1987) (order denying TRO); *Sierra Club v. Block*, 694 F.Supp. 1256 (E.D.Tex.1987).

Shortly after the hearing on the TRO, the Plaintiff TCONR filed a Second Amended Complaint adding additional claims that the even-aged management practices of the Forest Service contemplated in the recently completed Forest Plan, were in violation of the National Forest Management Act (NFMA), and the Forest Plan EIS was in violation of NEPA. The Government then moved for dismissal of the claims challenging the Forest Plan and the Forest Plan EIS since the Plaintiffs had not exhausted their administrative remedies by appealing their unsuccessful administrative challenges higher with the agency.

On January 19, 1988, after hearing oral argument on the Government's Motion to Dismiss, the Court ruled that the Plaintiffs had not exhausted their administrative remedies and that NFMA claims related to the Forest Plan and the Forest Plan EIS, would be dismissed from TCONR's Second Amended Complaint. The Court determined that the Plaintiffs had failed to meet the exhaustion requirement since their appeal challenging the Forest Plan was still pending in the agency. The Plaintiffs also failed to show that irreparable harm would result in the eight to fifteen months until the appeal was decided which could have triggered the exception to the exhaustion requirement. *Sierra Club v. Lyng*, 694 F.Supp. 1256 (E.D.Tex.1988) (order dismiss-

ing NFMA claims in TCONR's second amended complaint); *see, U.S. v. McKart,* 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). In the same order, the Court permitted the Sierra Club to file a First Amended Complaint, but also dismissed any portion of that complaint that related to the "Forest Plan" or NFMA. The remaining claims under the ESA, the Wilderness Act, and the APA were considered during the trial and evidentiary hearing, and are addressed in turn below.

## BACKGROUND

Picoides borealis, commonly known as the red-cockaded woodpecker, is a small undistinguished woodpecker indigenous to the southern United States. The evolutionary niche it has carved out places it at odds with modern man and man's industrialized society. The red-cockaded woodpecker is not well adapted to the real world as it exists today in the Texas national forests. The fact that its survival depends on a very specialized habitat bodes ill for the future of this bird. The voluminous evidence, both written and oral, introduced in the trial of this case leaves this Court with the firm persuasion that we are presiding over the last rites of this cohabitant of the blue planet.

This woodpecker makes no great or even necessary contribution to ecological balance, his song is unremarkable, and his plumage causes no heads to turn. However, these apparent shortcomings do not enter into the equation of the task assigned to this Court. The red-cockaded woodpecker's chief claim to fame is the fact that it succeeded in having its name inscribed on the endangered species list.[3]

The red-cockaded woodpecker is a small bird that lives almost exclusively in pine forests throughout the southern regions of the United States. The woodpecker prefers to nest in old growth pine trees, where it forages on insects, and occasionally small

fruits and seeds. The birds do not feed on the ground and usually forage in trees thirty years or older, preferring those sixty years or more. The woodpecker's foraging range may include an area up to one mile across.

The red-cockadeds are susceptible to various predators including snakes, owls, and other birds. The structure of their nests (more properly described as cavities) within living trees is such that sap oozes out around the actual cavity hole, thereby lessening the chances that predators will get to the young. The red-cockadeds also must fend off larger competing woodpeckers that attempt to "take over" their cavities and enlarge the nests. Individual cavity trees are referred to as colonies and on the average contain several birds. The last remaining populations of these birds are concentrated in the national forests, primarily because the old growth pines on private lands have largely been eliminated.

The national forests of Texas are managed under a multiple use system where the Forest Service is charged with the duty to provide recreation and protect wildlife, while simultaneously producing timber for industry. The proceeds of timber harvested inure to the Forest Service itself in the form of various discretionary funds, and to localities surrounding the national forest. Unfortunately for the woodpeckers, the current system of harvesting on a rotation system where trees are allowed to grow to only 60 to 80 years of age before they are harvested is in many respects, incompatible with their shelter, feeding, and reproduction requirements. The critical task the Forest Service has been and continues to be faced with is the maintenance of an adequate habitat for the birds while undergoing timber harvesting activities. Numerous elements enter into this formula that will be addressed below including the density of the forests, cutting techniques utilized, thinning of hardwoods near cavity trees, and insect treatment

3. The red-cockaded woodpecker has joined the ranks of other interestingly named flora and fauna, including the Santa Cruz long-toed salamander, the Dismal Swamp southeastern shrew, the purple-spined hedgehog cactus, and the Appalachian monkeyface pearly mussel. Of course, the listing of an animal or plant on the endangered species list is a distinction without cause for celebration. The list also includes the national symbol of our country, found on the seal of this Court—Haliaeetus leucocephalus, commonly known as the American bald eagle.

methods employed, to name a few. The Court necessarily turns to the task now before it.

The Court was privileged in this interesting case to have very able counsel on both sides of the controversy. The Court also recognizes that the quality of all the expert witnesses was extraordinary. The Court found William Lannan of the Forest Service to be an able and conscientous administrator who has been handed an impossible task—that is, to comply with the Congressional mandate relating to endangered species without being provided the funds to accomplish the task. Dr. Richard Connor, a wildlife expert with the Forest Service, is an imminently qualified scientist and dedicated public servant.

## FINDINGS OF FACT

### I.

The red-cockaded woodpecker population in the Sabine National Forest has declined seventy six percent (76%) between the years 1978 through 1987.

### II.

The red-cockaded woodpecker population in the Davy Crockett National Forest has declined forty one percent (41%) during the years 1983 through 1987.

### III.

The red-cockaded woodpecker population in the Angelina National Forest has declined forty two percent (42%) during the years 1983 through 1987.

### IV.

The entire population of red-cockaded woodpeckers in the Texas national forests will be extinct by 1995 if no changes are made in the present practices of the Forest Service.

### V.

The causes of the rapid decline in the red-cockaded woodpecker population over the past ten years in the Texas national forests include the following:

A. Fragmentation of habitat by clear-cutting practices which has resulted in separation of nesting and foraging areas.

B. Clear-cutting within foraging areas thereby reducing foraging habitat available to birds within their effective range.

C. Clear-cutting within 200 feet of actual colony sites and, in some instances, even up to cavity trees.

D. Failure to control hardwood mid-story encroachment around cavity trees in colony sites, around potential cavity trees in sites adjacent to colonies, and in foraging areas.

E. Failure to employ regular prescribed fire in colony and foraging areas to control hardwood and young pine encroachment.

F. Failure to provide an appropriate basal area in colony and potential recruitment stand sites.

G. The lack of availability of cavity trees of sufficient age—100 plus years—due to silvicultural practices employed over the past twenty (20) years by the Forest Service.

H. Disruption of colony areas by permitting the establishment of logging roads and the utilization of regularly traveled off-pavement roadways through site areas.

I. Damage to colony site and foraging area habitat trees by logging trucks and logging equipment.

J. The failure to identify and preserve mature trees containing redheart in habitat areas.[4]

### VI.

The forest supervisor for the national forest and grasslands in Texas, William Lannan, recognized that the Forest Service mandate regarding endangered species takes precedence over the Forest Service activities and made budget requests sufficient to comply with the requirements and suggestions contained in the Forest Service's red-cockaded woodpecker handbook. However, the budget submitted by the Ad-

---

4. Redheart disease is a naturally occurring infection that softens portions of the heartwood of pine trees, thereby making it easier for woodpeckers to excavate cavities. *See,* Conner & O'Halloran, "Cavity–Tree Selection by Red- Cockaded Woodpeckers As Related to Growth Dynamics of Southern Pines." *Post Trial Brief of Plaintiffs Sierra Club and The Wilderness Society,* attachment A (p. 406) (No. L–85–69–CA).

ministration and approved by the Congress for the past eight years has provided approximately ten percent (10%) of the funds necessary to comply with the Forest Service's red-cockaded handbook.[5] Moreover, no funds have been provided for mid-story removal as prescribed by the red-cockaded handbook for the past eight years.

### VII.

Funds received from the sale of timber on clear-cut tracts are available as discretionary funds for use in the management of the red-cockaded woodpecker. However, no such funds have been committed to red-cockaded woodpecker habitat preservation.

### VIII.

The red-cockaded woodpecker handbook, prepared in 1973, has never been fully implemented in the Texas national forests as it relates to habitat preservation or improvement.

### IX.

The Forest Service in Texas has not implemented a program to control hardwood mid-story, which is essential to the maintenance of red-cockaded woodpecker colonies.[6]

### X.

Areas clear-cut are not suitable for foraging by red-cockaded woodpeckers for a period of at least thirty (30) years from the date of reforestation, resulting in fragmentation and isolation of colonies and shunning of clear-cut areas for thirty (30) years by red-cockaded woodpeckers.

### XI.

Old trees—100 years or more—containing redheart are essential for bird survival and establishment of new or replacement colony trees. Any program that provides for harvesting these old trees mitigates against survival of the species in the Texas national forests.

### XII.

Sixty (60) square foot basal area is the optimum density taking into consideration the requirements of the red-cockaded woodpecker and factors relating to control of the southern pine beetle.[7]

### XIII.

Any rotation period of cutting by even-aged management methods (clear-cutting) that is economically advantageous to the Forest Service is incompatible with the survival of the red-cockaded woodpecker within colony and foraging habitat areas.

### XIV.

An analysis of clear-cutting versus selection management methods persuades the Court of the following facts:

1. Selection management has an initial twenty to twenty five percent (20–25%) economic advantage over clear-cutting as a result of the necessity of artificially seeding clear-cut areas.

2. Uneven age or selection management produces more wood per dollar spent and is more economically efficient over the productive life of a tract of timber.

3. Uniformity is best served by even-aged management.

4. Even-aged stands are more susceptible to southern pine beetle infestation.

5. The Forest Service contention that at rotation age there is little difference economically between clear-cutting and selection management is not pursuasive to the

---

**5.** The Wildlife Habitat Management Handbook (the Handbook) is a document prepared by the Forest Service composed of recommendations and proposed policies to protect the woodpeckers in the national forests. Defendants' Exhibit 11.

**6.** Hardwood mid-story is the growth of vegetation of the hardwood trees that surrounds pine trees containing the woodpeckers cavities. Hardwood mid-story encroachment reduces available foraging habitat and makes woodpecker cavities more accessible to predators such as owls and snakes.

**7.** The basal area, simply stated, is the measurement of the density of trees in a given area. The Wildlife Management Handbook of the Forest Service recommends a basal area of sixty (60) to ninety (90) square feet per acre for woodpecker foraging habitat. Obviously, clear-cutting reduces the basal area of the forest to zero. Seed-tree cutting (prior to the time the seed-trees are removed) averages about twenty (20) square feet per acre basal area, while shelterwood cutting leaves about forty (40) square feet of basal area.

Court. The Court is pursuaded that selection management does have economic advantages resulting from the avoidance of the high cost of regenerating clear-cut areas and the costs associated with the care required by highly vulnerable young stands. Selection management provides a good return during the entire lifetime of the period in question. Taking into consideration the value of money coupled with the high initial expense of even-age management, economic factors mitigate in favor of selection management. In addition to excellent economic returns, a well managed selection forest provides excellent habitat for deer and other wildlife, for recreational uses, and is pleasing to the eye of even city dwellers.

6. The sole reason for the Forest Service's adoption of even-age or clear-cutting as the management method of choice is the fact that it is preferred by the timber companies. The Forest Service is an agency that has experienced a high degree of the "revolving door" phenomenon between governmental and private interests. That is to say that the greatest market for government employees in private industry is with the large timber companies. This fact provides an incentive for agency personnel to accommodate industry desires—thus, that explains the high level of influence the timber companies have over policies and practices of the Forest Service.

### XV.

The initial Connor–Rudolph report introduced as Plaintiffs' Exhibit 27 is, as a whole, the best evaluation and study of the crisis facing the bird and the management practices that are essential, if survival is possible.

The Court finds that the following practices, at a minimum, must be adopted and implemented without delay if extirpation is to be avoided:

A. All initial red-cockaded management should be focused on active woodpecker colonies. Only after active colonies have received appropriate management should

management be directed at inactive colonies as future recruitment stands.

B. When thinning cuts are made within colony buffer areas, the basal area should be reduced in the entire colony area. Relict pine and other mature pines should be left standing and not cut as has been the case in the past.

C. The implementation of an aggressive removal program of existing hardwood mid-story is needed. The few large mast producing hardwoods that are found in colonies may be left standing within colony areas if they are not directly encroaching on cavity trees. All smaller hardwoods should be eliminated.

D. An aggressive prescribed burning program within woodpecker colonies and in colony home ranges is necessary. Fire should be used at least every two years on longleaf sites and every three to four years on loblolly sites or as soon as those sites will support a burn.

E. Stands within 1,200 meters of active woodpecker colonies should be thinned to a basal area of sixty (60) square feet per acre. Clear-cutting within 1,200 meters of active colonies must be eliminated and replaced with selection management. Old growth trees within 1,200 meters should not be harvested at all. A plan must be implemented providing more foraging habitat for the woodpecker than that which is contained in the current recovery plan, since anticipated required cuts to control the southern pine beetle will reduce woodpecker foraging habitat below minimum supply levels.

F. Within colony sites, logging roads or other off-pavement roadways should be eliminated and alternate routes utilized. In colony sites and within 1,200 meters of colony sites, extreme care should be taken when logging equipment is utilized for thinning or mid-story control activities.

### DISCUSSION

*1) Endangered Species Act Claims*

The taking claim is the primary issue currently before the Court. In short, the

Plaintiffs argue that the Forest Service's silvicultural practices and methods of managing the national forests of Texas have resulted in a taking of the red-cockaded woodpecker within the meaning of Section 9 of the Endangered Species Act (ESA). After considering the findings of fact described above, and reviewing the relevant statutes and cases, the Court similarly concludes that the Forest Service's actions constitute a taking under ESA. Section 7 of the Endangered Species Act, and the regulations promulgated thereunder, also imposes a duty on the Defendants to refrain from activities that jeopardize endangered species. The regulations also require the Defendants to re-initiate consultation with the United States Fish and Wildlife Service upon the receipt of new information that may affect endangered species. Based upon the findings, the Court has determined that past Forest Service management techniques and practices have violated Section 7 of the ESA.

As various federal officials have observed, the actions of man have taken an increasing toll on the survivability of various species, particularly those which, due to their peculiar habits and lifestyles, are unable to adapt to a changing environment. As the Assistant Secretary of the Interior Nathanial P. Reed observed in 1973:

> (M)an and his technology has (sic) continued at an ever-increasing rate to disrupt the natural ecosystem. This has resulted in a dramatic rise in the number and severity of the threats faced by the world's wildlife. The truth in this is apparent when one realizes that half of the recorded extinctions of mammals over the past 2,000 years have occurred in the most recent 50–year period.

Hearings on Endangered Species before the Subcommittee on Fisheries and Wildlife Conservation and the Environment of the House Committee on Merchant Marine and Fisheries, 93rd Cong., 1st Sess. 202 (1973). A recognition of this trend, in part, prompted Congress to enact the ESA in 1973 for the stated purpose of providing for the protection of endangered species' ecosys-

tems and conservation of the species themselves. 16 U.S.C.A. § 1531(b) (West 1985).

■ In the legislation as enacted, Congress' stated in unequivocal terms that "... all Federal departments and agencies *shall* seek to conserve endangered species and threatened species and *shall* utilize their authorities in furtherance of the purposes of this chapter." 16 U.S.C.A. § 1531(b) (West 1985) (emphasis added). While it is undisputed that the national forests are managed under multiple-use system that provides for timber harvesting, recreational use, and wildlife purposes, *See,* 16 U.S.C.A. § 528, *et seq.* (West 1985), the Forest Service must also comply with the provisions of the Endangered Species Act, and the accompanying regulations promulgated thereunder, *viz.* 50 C.F.R. 402.14, *et seq.* Although faced with sometimes competing interests, the Fifth Circuit has previously cautioned the Forest Service that it should not manage the forests in a particular manner "simply because it gives the greatest dollar return per unit output." *Texas Committee on Natural Resources v. Bergland,* 573 F.2d at 212. Furthermore, it is apparent from the language and spirit of the Endangered Species Act, that species so designated pursuant to Congress' mandate are to be afforded substantial protection by federal agencies. Endangered species, unlike timber, are not renewable resources.

The Court recognizes that goals and objectives of timber harvesting and protection of endangered species in some situations are at odds with one another. The Court also recognizes that Forest Service officials are charged with the authority to manage the national forests to produce timber for sale to private parties that benefits industry in the area as well as localities adjacent to the national forests. Nonetheless, the Congress considered and rejected the proposed legislation that would have directed agencies to implement the Endangered Species Act only "insofar as is practicable and consistent with the[ir] primary purposes...." H.R. 4758, 93rd Cong., (1973); *See, Tennessee Valley Authority v. Hill,*

437 U.S. 153, 181–82, 98 S.Ct. 2279, 2295, 57 L.Ed.2d 117 (1978). Instead, Congress mandated that agencies of the federal government conserve endangered species using "... all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C.A. § 1532(3) (West 1985).

The Endangered Species Act, through its various provisions, imposes a continuing duty on federal agencies. First, Section 7 of the ESA states that the various federal agencies must:

> ... *insure* that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species ...

16 U.S.C.A. § 1536(a)(2) (emphasis added). The Supreme Court has commented with regard to this language that, "(o)ne would be hard pressed to find a statutory provision whose terms were any plainer...." *Tennessee Valley Authority v. Hill*, 437 U.S. at 174, 98 S.Ct. at 2291. Second, federal agencies are required to carry out programs, with the assistance of the Secretary of Interior, to conserve endangered and threatened species since "... Congress intended to 'halt *and reverse* the trend towards species extinction, whatever the cost.'" *Carson–Truckee Water Conservancy District v. Clark*, 741 F.2d 257 (9th Cir.1984), *cert. denied*, 470 U.S. 1083, 105 S.Ct. 1842, 85 L.Ed.2d 141 (1985), *quoting, Tennessee Valley Authority v. Hill*, 437 U.S. at 184, 98 S.Ct. at 2296. (emphasis supplied). Furthermore, in evaluating the overall legislative purpose of the Endangered Species Act, the Supreme Court observed that the statute, "indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *Tennessee Valley Authority v. Hill*, 437 U.S. at 174, 98 S.Ct. at 2292. It is against this backdrop that the Court begins its analysis.

Section 9 of the ESA provides that "it is unlawful for any person subject to the jur-isdiction of the United States to ... take any such species within the United States or the territorial sea of the United States...." 16 U.S.C.A. § 1538(a)(1)(B) (West 1985). It is undisputed that the red-cockaded woodpecker is an endangered species. 50 C.F.R. 17.11 (1987). In fact, it was one of the earliest species placed on the endangered list, since it was so designated on October 13, 1970. 37 Fed.Reg. 16047 (1970). It is also clear that the Defendants fall within the meaning of a "person" for the purposes of the Act since the definition includes "... any officer, employee, agent, department, or instrumentality of the Federal Government...." 16 U.S.C.A. § 1532(13) (West 1985); *Tennessee Valley Authority v. Hill*, 437 U.S. at 184–85, 98 S.Ct. at 2297.

The term "take" applicable to the above cited provision means, "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C.A. § 1532(19) (West 1985). The relevant element of the "take" definition that is of concern in the case *sub judice* is the prohibition against "harming" an endangered species. The definition of harm is described in the Forest Service Regulations at 50 C.F.R. § 17.3 (1987), as follows:

> "Harm" in the definition of "take" in the Act means an act which actually kills or injures wildlife. *Such an act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavorial patterns, including breeding, feeding or sheltering.

50 C.F.R. § 17.3 (1987) (emphasis added). It is uncontested that a severe decline in the population of woodpeckers has occurred in the past ten years. "Harm" does not necessarily require the proof of the death of specific or individual members of the species. *See, Palila v. Hawaii Dept. of Land and Natural Resources*, 471 F.Supp. 985 (D.Hawaii 1979), *aff'd.*, 639 F.2d 495, 498 (9th Cir.1981) (*Palila I*), *Palila v. Hawaii Dept. of Land and Natural Resources*, 649 F.Supp. 1070, 1076–77 (D.Ha-

waii 1986), *appeal docketed*, No. 87–2188 (9th Cir. June 10, 1987) (*Palila II*), but as the numbers show themselves, large percentages of the few remaining birds have died.[8]

■ The statistical information regarding the Sam Houston National Forest is still being compiled, however the statistics in the remaining forest are illustrative of the current situation. The Davy Crockett National Forest underwent a forty one percent (41%) depopulation from forty six (46) colonies in 1983 to twenty seven (27) in 1987. A forty two percent (42%) decline was recorded in the Angelina National Forest from thirty eight (38) colonies in 1983 to twenty two (22) in 1987. The population has declined seventy six percent (76%) in the Sabine National Forest from twenty five (25) colonies in 1978 to seven (7) in 1987. The average colony site contains from one to four birds, with two-bird colonies being the norm.

The Forest Service contends that its continuing conduct does not fall within the definition of "take" described above. The Forest Service even prepared a document, referred to in the record as the "Strategy," that was presented to the Court on the eve of trial, setting forth a series of practices that the Forest Service was willing to implement to remedy past management decisions that have impacted upon the woodpecker. Nonetheless, based upon the findings of this Court, one cannot escape the conclusion that the Forest Service's practices have harmed the birds within the meaning of the regulations, in a number of different ways, evidenced by the precipitous decline in the woodpecker population in recent years. *Palila v. Hawaii Dept. of Land and Natural Resources*, 471 F.Supp. 985 (D.Hawaii 1979), *aff'd.*, 639 F.2d 495 (9th Cir.1981) (*Palila I*); *Palila v. Hawaii Dept. of Land and Natural Resources*, 649 F.Supp. 1070 (D.Hawaii 1986), *appeal docketed*, No. 87–2188 (9th Cir. June 10, 1987) (*Palila II*); *See, Tennessee Valley Authority v. Hill*, 437 U.S. at 184–85, 98 S.Ct. at 2297.

■ The practice of even-aged management has resulted in significant habitat modification in varied ways described in the findings of fact. This is not merely a situation where the *recovery* of the species is impaired by the agency's practices, *Palila*, 649 F.Supp. at 1075, but rather the agency's practices themselves have caused and accelerated the decline in the species. For example, in the Sabine National Forest, the population as estimated in 1987 was seven (7) red-cockaded woodpecker colonies, which represented only thirteen (13) birds. It may prove to be too late to save this population, however the remaining birds in the other forests may be saved from extinction if current forest management practices are modified. The entire remaining population of red-cockaded woodpeckers in the three national forests surveyed in the several Conner reports was only 113 birds as of 1987.

It is apparent that all four factors cited in the regulations defining "harm" are implicated by the current management practices employed by the Forest Service. First, essential behavorial patterns of the woodpeckers have been impaired by isolation of woodpecker colonies from one another by creating "islands" of older growth stands surrounded by clear-cuts. Even-aged management within 1,200 meters of woodpecker colonies alters the customary habits of the birds to survive and produce young. For example, maintaining high basal areas to maximize lumber return makes the forests generally, and the woodpecker colonies particularly susceptible to outbreaks of southern pine beetles. Failure to employ mid-story removal of hardwoods also contributes to woodpecker abandonment of cavity trees. Second, isolation of particular colonies interferes with breeding

---

**8.** Judge King's analysis in the latest *Palila* case is particularly inciteful, as it relates to the definition of harm. In 1981, the proposed redefinition of harm to "an act which injures or kills wildlife," was abandoned because habitat modification combined with an impact on the species could be considered a taking. *Palila*, 649 F.Supp. at 1076–77.

practices, since males cannot find females to breed with, thereby contributing to the population decline. Isolation also causes the gene pool to be reduced with fewer birds in a given area, causing genetic problems and abnormalities in the subsequent generations.

Third, with clear-cutting in close proximity to woodpecker colonies, foraging areas are limited, making it difficult for the birds to find nourishment since they do not feed on the ground. This forces the birds to expend more energy in searching for any remaining trees with food, than they can derive from the nourishment they eventually find. Obviously, the "law of diminishing returns" comes into play, decreasing the chances for the birds' survival, not to mention the possibility for recovery. Furthermore, with the harvesting of older pine trees, the birds have more difficulty finding insects to eat on the remaining younger pines with smooth bark and less surface area. The older pines with rough bark have crevices and cracks where insects can live, thereby providing the birds with an available food source.

Fourth, even-aged management has eliminated the older stands of pines needed by the birds for excavation of cavities to use as nests. In addition, cutting of trees which serve as windbreaks around the cavity trees subjects the cavity trees to increased chances of blow-downs or windthrow. This is especially true since the cavity trees are already somewhat weakened by redheart and the excavation of the woodpecker nest. Since it takes a red-cockaded woodpecker anywhere from one to four years to excavate a cavity, the loss of the cavity tree is a significant loss for the bird who must expend lots of energy to excavate another cavity. Certainly, other practices and policies of the Defendants described in the findings of fact, when taken as a whole, detrimentally impact upon the woodpecker and are largely responsible for the rapid decline of the remaining birds in Texas.

■ The Court has also further concluded that the actions described above, relevant to the taking issue, similarly implicate Section 7 of the ESA because they also "jeopardize" the species within the meaning of the Act. 16 U.S.C.A. § 1536(a)(2) (West 1985); *Tennessee Valley Authority v. Hill,* 437 U.S. at 181–87, 98· S.Ct. at 2295–98. The federal regulations, 50 C.F.R. § 402.02 (1987), define "jeopardize," as used in the ESA to mean:

> ... To engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species.

50 C.F.R. § 402.02 (1987). The management practices employed, that have lead this Court to conclude that a taking has occurred, necessarily includes a finding that such conduct also jeopardizes the species. Accordingly, the Court concludes that the Plaintiffs have carried their burden of proof in showing that the Defendants "have failed to take the 'action necessary to insure' " that their current management practices does not jeopardize the continued existence of the woodpecker or will not destroy or modify habitat essential for its survival. *National Wildlife Federation v. Coleman,* 529 F.2d 359, 372 (5th Cir.1976), *cert. denied,* 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976). The applicable standard of review for a Section 7 claim (as opposed to a Section 9 claim) is whether the agency's actions taken pursuant to the Statute are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. After undergoing the required consultation with the Secretary of Interior, "the federal agency involved must determine whether it has taken *all necessary* action to insure that its actions will not jeopardize the continued existence of an endangered species or destroy or modify habitat critical to the existence of the species." *National Wildlife Federation v. Coleman,* 529 F.2d at 371.

The question for judicial review is then—whether the decision was based upon an assessment of the relevant factors and whether there has been an error of judgment. *National Wildlife Federation v. Coleman*, 529 F.2d at 372, *quoting, Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). *Coleman* involved a situation where the district court failed to enter an injunction to protect endangered Mississippi Sandhill Cranes from a construction project. The Court concludes in the case at bar, as did the Fifth Circuit in *Coleman*, that the Forest Service has failed to take the necessary steps to insure that the current management practices will not jeopardize the woodpeckers.

The Forest Service is required to re-initiate formal consultation with the U.S. Fish and Wildlife Service, pursuant to 50 C.F.R. § 402.16 (1987), when it becomes apparent that new information may impact a species. The Conner Reports indicated that the woodpecker population had substantially declined within the national forests. This new information was relevant, in that it pointed out the deficiencies in current forest management practices, as it impacted upon to the future survival of the endangered woodpeckers. Moreover, 16 U.S.C. § 1536(a)(2) and 50 C.F.R. § 402.14(a), requires agencies contemplating actions that may affect an endangered species to obtain biological opinions regarding potential jeopardy to endangered species. The Court is satisfied that there has been ongoing consultation with wildlife experts in the development of various plans and strategies to deal with the steady decline of woodpeckers. The problem does lie with the plans as formulated, but more importantly the ongoing actions of the agency are contrary to law.

The Court recognizes that it was the federal government's action that lead to the Conner Report, and the Forest Service should not necessarily be characterized as the "villain" in these proceedings. However, the numbers speak for themselves, as does the testimony of numerous experts in the fields of biology, forest management, and zoology who appeared before this Court. The future prospect for the bird, even from the testimony of the Defendants' own witnesses, appears at best to be speculative if changes in current forest management practice are not implemented immediately. What this case really boils down to is the Forest Service's *implementation* of practices identified by its own experts and recognized by its own documents as critical to save this bird from extinction.

In reversing a lower court that denied injunctive relief, the Fifth Circuit has similarly recognized that Section 7 of the Endangered Species Act,

> ... imposes on federal agencies the mandatory obligation to insure that any action carried out by them does not jeopardize the existence of an endangered species, or destroy critical habitat of species.

*National Wildlife Federation v. Coleman*, 529 F.2d at 373.[9] For the reasons described above, the Court concludes that the Defendants have failed to meet this requirement or fulfill the stated duties.

### 2) Violation of the Wilderness Act

The Wilderness Act, 16 U.S.C.A. §§ 1131–1136 (West 1985), provides that designated wilderness areas are to be protected and managed so as to preserve their unspoiled state. These areas include lands "where the earth and its community of life are untrammeled by man ... retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions." 16 U.S.C.A. § 1131(c) (West 1985). Strict con-

---

9. The Defendants had previously filed a motion for summary judgment on this issue, therefore, for the reasons explained in this opinion, the motion is without merit, and it is DENIED.

trols are maintained over activity within wilderness areas, and a number of prohibited activities are described in the statute. Subsection (c) of Section 1133, for example, provides that:

> (e)xcept as specifically provided for in this chapter and subject to existing private rights, there shall be no commercial enterprise and no permanent road within any wilderness area designated by this chapter and except as necessary to meet minimum requirements for the administration of the area for the purposes of this chapter ..., there shall be no temporary road, no use of motor vehicles, motorized equipment or motor boats, no landing of aircraft, no other form of mechanical transport, and no structure or installation within any such area.

16 U.S.C.A. § 1133(c) (West 1985). In addition to this general prohibition of certain disruptive activities, the statute contains an explicit provision regarding activities designed to control insects. 16 U.S.C. § 1133(d)(1) provides in pertinent part that:

> (w)ithin wilderness areas designed by this chapter ... such measures may be taken *as may be necessary* in the control of fire, insects, and diseases, subject to such conditions as the Secretary deems desirable.

16 U.S.C.A. § 1133(d)(1) (West 1985) (emphasis added). Under the current Pine Beetle Control Program, the treatment method consists primarily of buffer cutting swaths of trees down around an outbreak area. One stated objective is to essentially create a "fire-break" around the infested area to prevent spread of beetles to adjacent private and federal lands.

The Plaintiffs set forth a two-pronged argument under the Wilderness Act. First, the Plaintiffs contend that under 16 U.S.C.A. § 1133(c), before motorized equipment may be used or temporary roads of any kind may be created within federal Wilderness Areas, it must be established that such a use is both: 1) necessary in order to comport with the management purposes articulated in the Wilderness Act, and 2) the minimum tool available to satisfy the management purpose. Second, the Plaintiffs argue that the Forest Service's Beetle Program is not a successful means of controlling the outbreaks of the southern pine beetle, and therefore since the treatment method is not "effectual," it cannot be deemed to be "necessary" under 16 U.S.C.A. 1133(d)(1). In essence, the Plaintiffs argue that a program which is not "effective" could not logically be considered to be "necessary."

The Defendants assert that regardless of the claims made by the Plaintiffs, the doctrine of res judicata prevents this Court from relitigating these claims that were addressed by the U.S. District Court for the District of Columbia in the action *Sierra Club v. Lyng*, 663 F.Supp. 556 (D.D.C. 1987) (hereinafter DC litigation). The District of Columbia court ruled against these Wilderness Act claims and arguments stating:

> Plaintiffs read the act too broadly. First, there is no ground for concluding that Congress used the term necessary in the absolute sense urged by plaintiffs. Under the statute, various measures are authorized to the extent that they "may be necessary in the control ... of insects...." The most natural reading of the Section focuses on the phrase "necessary in the control." In this context "necessary" simply embraces measures needed to achieve a certain result or effect, (citations omitted)—that is, measures that are needed as part of a program designed to control, in the sense of restrain or curb, beetle infestations.

663 F.Supp. at 559. The Plaintiffs assert that the challenged practice in the DC litigation included only forests in Arkansas, Louisiana, and Mississippi, and not Texas, therefore the result reached in the DC litigation should not be applied here. This argument is without merit. The Court is persuaded that the District of Columbia action involved substantially the same factual issues and virtually identical legal issues to those asserted in this case. As to Plaintiff Sierra Club and the Wilderness Society, the doctrine of res judicata prohibits re-litigation of these claims in this

Court. *Kurzweg v. Maple,* 841 F.2d 635, 639–40 n. 12 (5th Cir.1988).

■ Plaintiff TCONR was not a party to the District of Columbia litigation, therefore due process considerations may prevent a judgment from being applied under a theory of collateral estoppel. *Blonder-Tongue Laboratories v. University of Illinois Foundation,* 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788 (1971). Arguably, TCONR was not a party to the DC litigation and would not have been able to present arguments in support of its position. Nonetheless, the same result would obtain since this Court reaches an identical conclusion on the merits as that held by the District of Columbia court, which stated:

> (t)he pertinent section of the statute is therefore most reasonably construed as allowing the Secretary to use measures that fall short of full effectiveness so long as they are reasonably designed to restrain or limit the threatened spread of beetle infestation ... The degree of efficacy of various control methods is not to be debated between various scientists and resolved before this Court. The Secretary's judgment that the control measures authorized are reasonably efficacious is entitled to respect under Section 10 of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1982), unless shown to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

*Sierra Club v. Lyng,* 663 F.Supp. at 560. Although "buffer cutting" and other techniques used by the Forest Service to control the southern pine beetle may not be entirely effective, they are nonetheless efficacious to some degree. Furthermore, this Court is not in a position to resolve conflicting scientific opinions about what is the "best" course of action in combatting insects in the national forests of Texas. *Sierra Club v. Froehlke,* 816 F.2d 205 (5th Cir.1987). It is also clear from the record that southern pine beetle control is necessary not only to protect potential timber that may be harvested, but also to protect the cavity trees and foraging area of the red-cockaded woodpecker.

Certainly, any established silvicultural practices of the Forest Service in insect control must maintain and take into account the delicate balance between protecting the forest from beetles and irreparably destroying the habitat of the birds through the treatment method employed. The judiciary's role in this process is a limited one, thus the Forest Service's appropriate discretion is entitled to some deference. Of course, this regulatory discretion should not be construed to be a "carte blanche" license to buffer-cut or clear-cut within the perimeter of the woodpecker colonies described in this order, in the name of beetle control.

In sum, for the reasons described above, the substance of the Plaintiffs' claims under the Wilderness Act regarding the absolute need for effectuality in the statute are not persuasive. Accordingly, the Court concludes that the Wilderness Act claims do not provide the Plaintiffs with the relief they seek.

### 3) Denial of a Stay by the Forest Service

■ Plaintiffs Sierra Club and TCONR each requested a stay of the implementation of the Forest Plan pending final resolution of the appeal challenging the provisions of the Plan. TCONR requested a stay of all timber operations under the even-aged management system until 45 days after receipt of a final decision, pursuant to 36 C.F.R. 211.18(h)(5) (1987). TCONR sought a stay to protect the woodpeckers and forest resources until the final decision of whether the Forest Plan was in compliance with the NFMA is made by the agency.

The stay sought a prohibition of clear-cutting, shelterwood cutting, and seed-tree cutting throughout the national forests in Texas, excepting ordinary thinning sales, fire control, or other activities that would be amenable to individual-tree selection management. TCONR Notice of Appeal, p. 1. In short, the Plaintiffs requested that the Forest Service halt implementation of anything other than selection management

in all the forests until the appeal was decided.

The Plaintiffs assert that the denial of the stay was arbitrary, capricious, and contrary to law under the APA, 5 U.S.C. § 706(2)(A) (West 1985). Plaintiffs contend that the stay denial ignored the alternative of uneven-aged or selection management for the interim period until the appeal was decided. The Plaintiffs contend that such a stay would have protected the habitat of the red-cockaded woodpecker as well as the forests' biological diversity, in conformance with NFMA, and would also have lessened the economic impact to the timber industry. The Plaintiffs assert that the Forest Service could have opted for some timber harvesting under selection management, and should have considered this alternative, rather than denying the stay outright.

Generally, the courts have a fairly limited role of review under the APA, and "(u)nder this standard, agency action may only be set aside if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *United States v. Garner*, 767 F.2d 104, 115–116 (5th Cir.1985). A court is also instructed to accord the decisions of the agency with a presumption of regularity, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), and should not substitute its own judgment of what is proper, for the decision of the agency. On the other hand, a court should not simply act as a rubber stamp approving all agency action when there is no "rational connection between the facts found and the choice made." *United States v. Garner*, 767 F.2d at 116, *quoting, Motor Vehicle Manufacturers Ass'n. v. United States*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). In summary, this Court's review of the denial of the administrative stay hinges upon whether the decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974), *quoting, Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

The applicable Forest Service regulations provide that in deciding stay requests, the reviewing officer must consider:

1) Information provided by the requester pursuant to paragraph (3)(iii) including the validity of any claims of injury to the requester or the public interest.

2) The effect a stay decision would have on the preservation of a meaningful appeal on the merits.

3) Any other factors the Reviewing Officer may consider relevant.

36 C.F.R. 211.18(h)(5) (1987). On August 14, 1987, the Chief of the Forest Service issued decisions denying the stay requests of both the Sierra Club and TCONR. The Forest Service concluded that, among other things:

(to) defer harvest or other related activities for this length of time (6 months to 2 years) could have a serious effect on the wood products industry that relies upon the timber from these Forests and on the people employed in that industry ... Such injuries to the public interest weigh heavily against a stay.

In addition, the Forest Service cited that TCONR's appeal would be preserved and that to supply the broad based relief requested by the Plaintiffs would require decades to implement.

At the outset, it is important to evaluate the stay denial in the proper context. The Forest Service should have applied the factors in the regulations outline above, and the analysis here will be primarily limited to those requirements. The denial of the stay, contrary to Plaintiffs' contentions, is not arbitrary, capricious, or contrary to law. The Plaintiffs contend that the agency must consider a variety of alternatives in selecting a cause of action, otherwise the ruling is invalid under the APA. The factors which must be weighed by the agency are clearly set out and applied in the Forest Service's ruling. While it may be the case that selection management is a better alternative, this Court is constrained

to the narrow arbitrary and capricious scope of review, and will not second guess the course of action chosen by the agency, with respect to the issuance of a stay.

The Plaintiffs' appeal right was preserved and the potential impact on the "public interest" was appropriately relied upon by the agency in ruling on the decision to deny the stay. While the Plaintiffs object to the Forest Service's assessment of public interest contained in the ruling, the considerations cited were valid ones for assessment by the agency. Furthermore, the Court does not believe that the Forest Service's failure to consider a stay shifting to a forest-wide system of selection management pending the final Forest Plan appeal, was fatal to the agency under the APA. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 416, 91 S.Ct. at 824.[10] In conclusion, for the reasons described above, the denial of the stay was proper under the APA, and therefore will not be overturned.

### INJUNCTION

■ The voluminous record of this case, including the testimony of numerous scientific experts, assessments of Forest Service officials, federal government studies of the woodpeckers, and others familiar with the situation in the national forests of Texas conclusively demonstrate to the Court that a permanent injunction is warranted in this case.

To receive injunctive relief the Plaintiffs must establish four facts: 1) actual success on the merits, 2) a substantial threat of irreparable harm absent an injunction, 3) that the irreparable harm threatened is greater than that caused by the injunction, and 4) the public interest would be served by the injunction. *Tubwell v. Griffith*, 742 F.2d 250, 251 (5th Cir.1984); *Canal Authority of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974); *See also, Amoco Production Co. v. Village of Gambell,*

*Alaska,* 480 U.S. 531, ——, 107 S.Ct. 1396, 1404, n. 12, 94 L.Ed.2d 542 (1987). With regard to the first element, it is apparent by this decision that the Plaintiffs have succeeded. *See, University of Texas v. Camenisch*, 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) (requirement of actual success on merits for a permanent injunction). It is also clear from the testimony received by the Court that, insofar as the management practices directly affect the red-cockaded woodpeckers and their colonies, irreparable harm would result if action was not taken immediately in the zones surrounding the colonies. The woodpeckers are on the verge of extinction and the steadily declining population necessitates the actions cited.

Third, the harm to the woodpecker through extinction would outweigh any harm caused by this injunction. To be sure, timber harvesting in certain areas of the forest immediately surrounding the colonies will be affected. However, harvesting of timber by selection management methods may continue within the 1,200 meter area. Moreover, other even-aged management techniques outside of the colony zones, may continue in accordance with applicable federal laws and regulations. Finally, the Court concludes that the public interest will be served by the attempt to preserve this species. Congress has recognized the importance of preserving such forms of life in passing the Endangered Species Act. The United States Supreme Court has similarly held that:

> Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as "institutionalized caution."

*Tennessee Valley Authority v. Hill*, 437 U.S. at 194, 98 S.Ct. at 2301. The value of preserving endangered species includes the

---

**10.** The final issue of whether the Forest Plan is in compliance with NFMA is presently before the agency for determination, and a ruling will be issued in the not to distant future. The continuing battle over the overall management of the national forests (as distinguished from the management involving only the red-cockaded woodpecker colonies) is not yet over, and the remaining shots by the various opposing parties have yet to be fired.

potential uses that endangered species have that might ultimately benefit man, not to mention the "unforeseeable place such creatures may have in the chain of life on this planet." *Tennessee Valley Authority v. Hill,* 437 U.S. at 178, 98 S.Ct. at 2293. While to some this may appear to be an awfully big case over just a small bird, this Court is not vested with the authority under our system of government to pre-empt the legitimate purposes of the Congress in enacting the Endangered Species Act. Hence, the bird wins in this, his latest struggle for survival.

### REMEDIAL MEASURES TO BE IMPLEMENTED BY THE DEFENDANTS

Based upon the above findings of fact and conclusions of law, the Court hereby issues a permanent injunction enjoining the Defendants from failing to implement the following practices and procedures within 1,200 meters of identified active and inactive red-cockaded woodpecker colony sites in the national forests of Texas:

1) Conversion of forest harvesting techniques from even-aged management to a program of selection or uneven-aged management that preserves "old growth" pines from cutting, within 1,200 meters of any colony site.

2) Establishment of a basal area of sixty (60) square feet per acre, within 1,200 meters of any colony site.

3) Establishment of a program of mid-story removal of hardwoods in and adjacent to colony sites.

4) Discontinue the use of existing logging roads or other non-paved roads within colony sites and restrict the use of such roadways to the essential minimum within 1,200 meters of any colony site.

Additionally, the Court grants the Defendants sixty (60) days to produce and compile a "Comprehensive Plan" to address all aspects of future management techniques, consistent with the findings and conclusions of the Court, designed to maximize the probability of survival of the red-cockaded woodpeckers in the national forests of Texas.

The Comprehensive Plan should *not* be restricted to the techniques described in the Forest Service's currently existing red-cockaded woodpecker handbook or the recovery plan, but should additionally provide an overall mechanism for monitoring the Plan itself, as well as its application and enforcement. Finally, the Comprehensive Plan should include a provision for a periodic review and evaluation of techniques to be employed, specifically relating to the success or failure of various actions. The Defendants shall submit the Comprehensive Plan to the Court for approval on or before August 16, 1988.

The parties may have the opportunity to modify provisions of this order and injunction by a motion duly submitted to the Court. A hearing may be granted to address the substance of a motion that seeks to modify this order, should the Court deem it to be advisable under the circumstances. This order will remain in effect pending further order of the Court.

IT IS SO ORDERED.