SIERRA CLUB, etc., et al.,
Plaintiffs–Appellees,

v.

Clayton K. YEUTTER, etc., et al.,
Defendants–Appellants.

No. 88–6041.

United States Court of Appeals,
Fifth Circuit.

March 4, 1991.

---

John A. Bryson, Robert L. Klarquist, Land & Natural Resources Div., Dept. of Justice, Washington, D.C., for defendants-appellants.

Edward Fritz, Texas Committee on Natural Resources, Dallas, Tex., Mary Alice Van Kerrebrook, Co–Counsel on Texas Committee on Natural Resources, Houston, Tex., for plaintiff-appellee Texas Committee on Natural Resources.

Douglas L. Honnold, Federico Cheener, Sierra Club Legal Defense Fund, Denver, Colo., for plaintiffs-appellees Sierra Club and The Wilderness Soc.

Mary Ruth Holder, Asst. Atty. Gen., Environmental Protection Div., Austin, Tex., for amicus curiae, State of Tex.

James A. Cornelius, Zeleskey, Cornelius, Hallmark, Bagfeld & Roper, Ron Hufford, Texas Forestry Ass'n, Lufkin, Tex., for amicus curiae, Texas Forestry Assoc.

Before KING, GARWOOD and
SMITH, Circuit Judges.

GARWOOD, Circuit Judge:

Defendants-appellants Clayton Yeutter,
et al. (the government) appeal two injunctive orders of the district court in favor of plaintiff-appellees Sierra Club, et al.

## Facts and Proceedings Below

This litigation concerns the red-cockaded woodpecker (RCW), a species of woodpecker that has garnered a position on the endangered species list, as provided by the Endangered Species Act of 1973 (ESA), 16 U.S.C. §§ 1531–43; see also 50 C.F.R. § 17.11 (1989) (listing endangered species). The RCW lives mainly in isolated areas of national forests in the southern regions of the United States, extending from Virginia to Florida and westward to East Texas.[1]

The RCW nests and forages in several species of Southern pine trees, creating cavities in live trees that serve as nests. The resin flow in live pine trees that forms around the cavity opening provides the cavity a protective barrier against predators. Because older trees have softer wood as a result of age and, often, redheart disease and hence are easier to excavate, the bird prefers trees that range in age from roughly 60–120 years.

The survival of the species has long been at risk, coincident with the dwindling range of the coastal Southern pine forests and the destruction of the species' natural habitat. Infestation of the Southern pine beetle has compounded the problem by denying the RCW old-growth pines. In fact, on April 17, 1985, the Sierra Club, Wilderness Society, and Texas Committee on Natural Resources (TCONR) filed this action originally to challenge the United States Forest Service's (USFS) policy of cutting trees in Texas wilderness areas to control the pine beetle infestation. The plaintiffs alleged that the beetle-control-tree-cutting policy

violated the Wilderness Act, 16 U.S.C. §§ 1131–36, as well as the ESA and the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–47. See Sierra Club v. Block, 614 F.Supp. 134 (E.D.Tex. 1985). Pending a trial on the merits, the court denied TCONR's request to halt all timber cutting in East Texas national forests, but granted it limited relief. Id. at 139–41.

The nature of the litigation changed dramatically, however, in late 1987 when two United States Forest Service (USFS) scientists documented a dramatic forty to fifty percent decline in active RCW colonies in three of four national forests in Texas from 1983–87. As a result only 113 of the birds existed in Texas in 1987.

The USFS, an agency of the Department of Agriculture, manages the national forests and is authorized to sell timber to industry. The revenues raised help finance the agency and provide economic assistance to adjacent rural counties. Since 1964 the Forest Service has conducted "even-aged" harvesting of its lumber resources. Under this method, entire sections of forest are cut, on a rotational basis, and then allowed to regenerate for the next sixty to eighty years. Three alternative methods for achieving regeneration exist.

First, if an area has been clearcut, i.e., all the trees have been cut, it may be regenerated artificially by planting seeds or seedlings. Second, rather than clearcut an area, a few trees may be left to seed the area naturally. This is called seed-tree cutting. Finally, under the shelterwood cut method, an even greater density of trees, compared to the seed-tree cutting method, is left to provide regeneration. Under the latter two regeneration schemes, however, the salvaged trees are cut a few years later, in a second phase, to provide unimpeded growth for the new stand of trees. Consequently, the maximum tree age is determined by the rotational schedule for such lumbering. An alternative to even-aged harvesting is uneven-aged manage-

---

1. The national forests in East Texas include the Sam Houston National Forest, the Angelina Na-

tional Forest, the Davy Crockett National Forest, and the Sabine National Forest.

ment or "selection" harvesting. Under this scheme, in contrast to even-aged management, an area will contain a mix of trees of different ages, as trees to be harvested are selected individually.

As a consequence of the RCW's federal listing as an endangered species, under the ESA, the Secretary of the Interior, who operates through an agency of the Department, the United States Fish and Wildlife Service (USFWS), is charged with managing recovery of the species. *See* 16 U.S.C. § 1533(f). All federal agencies, including the USFS, must "consult" with the USFWS to ensure that agency action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of the habitat of such species...." § 1536(a)(2). If the USFWS finds that the habitat is in jeopardy or subject to adverse modification, it "shall suggest those reasonable and prudent alternatives" to the federal agency to protect the listed species by issuing a "biological opinion." *See* § 1536(b)(3)(A); 50 C.F.R. § 402.02 (1989). If new information becomes available pertaining to the harmful effects of previously approved agency action, the consultation process must be repeated with the USFWS. *See* 50 C.F.R. § 402.16 (1989).

The USFS published a wildlife management handbook in 1979 concerning silvicultural practices in relation to the RCW's habitat. The handbook endorsed a two hundred foot buffer zone—to be free of pine tree cutting—for active RCW colonies, coupled with a hardwood management program. Beyond the buffer zone, even-aged logging could continue on a sixty to eighty year rotational cycle, depending on the species of pine tree. The USFWS recommended a longer rotational cycle, but otherwise endorsed the USFS's RCW management handbook in a subsequent biological opinion. In 1984–85, the USFS again consulted with the USFWS concerning republication of the handbook for the RCW. On February 15, 1985, the USFWS issued a biological opinion approving the handbook.

When the decline in the RCW population became publicly known in 1987, reconsultation between the USFS and the USFWS was interrupted when the TCONR filed an amended complaint in this case on October 22, 1987, alleging, among other things, that the USFS's timber management practices harmed the RCW in violation of sections 7 and 9 of the ESA, 16 U.S.C. §§ 1536(a)(2), 1538(a)(1)(B). This amended complaint challenged the USFS's general timber management and even-aged harvesting practices—not simply the beetle control cutting program, as had the original April 1985 complaint (although the amended complaint also included the earlier ESA and other attacks on the beetle control cutting) —as harmful to the RCW and thus in violation of the ESA. The TCONR at the same time sought a temporary restraining order halting all even-aged harvesting in the East Texas national forests, but the court denied this request. On January 18, 1988, the Sierra Club and The Wilderness Society filed an amended complaint as well, raising similar claims to those of the TCONR's amended complaint.

The environmental groups maintain that even-aged management rarely allows trees to grow beyond eighty years even though the RCW generally prefers trees over one hundred years in age to escape predators, forage, and build nesting cavities. The environmental groups also contend that the USFS's policy of suppressing all forest fires, including controlled ones, has had an adverse impact on the bird's population and habitat because such fires destroy hardwood trees—trees that detrimentally shade pines and harbor predators of the RCW.

The district court conducted a four-day trial pursuant to Fed.R.Civ.P. 65(a)(2) concerning the environmental groups' plea for a permanent injunction and heard conflicting scientific testimony. See *Sierra Club v. Lyng*, 694 F.Supp. 1260 (E.D.Tex.1988). In an order entered June 17, 1988, the court found that the RCW population in the Texas national forests had indeed declined precipitously and that the species would be extinct by 1995 absent a change in the USFS's lumbering management. Further, the court traced the decline directly to the

USFS's silvicultural practices as well as to its failure to control hardwood encroachment and its logging practices. Pointing to the USFS's wildlife handbook and the report issued by its scientists concerning the decline of the RCW population, the court concluded that a "tree density" or "basal area" of sixty square feet of tree trunks per acre is optimal for the species in light of the competing need to control pine beetle infestation. It also found that a selective method for harvesting trees is less expensive than clear cutting because the latter requires artificial seeding, and that selection management forests are less susceptible than even-aged forests to pine beetle infestation. The court determined that "[t]he sole reason for the Forest Service's adoption of even-aged or clear-cutting as the management method of choice is the fact that it is preferred by the timber companies." *Sierra Club*, 694 F.Supp. at 1268.

The district court held that USFS was in violation of sections 7 and 9 of the ESA,[2] determining that its current management practices "harmed" essential RCW behavioral patterns, interfered with breeding, and degraded its nesting and foraging habitat. However, the court rejected the claim that the USFS violated the Wilderness Act in cutting trees to stem the beetle infestation.[3] Nevertheless, with respect to logging practices in the vicinity of the active RCW colonies, the district court enjoined further even-aged lumbering in the Texas national forests within 1,200 meters of active colonies.

Concluding that the USFS was "harming" and thus "taking" a protected species in violation of the ESA, it ordered that the USFS promulgate within sixty days a "comprehensive plan" to maximize the probability of survival for the RCW in the national forests of Texas. The district court imposed some restrictions upon any future plan, principally including the following: (1) that any timber harvesting practices within 1,200 meters of RCW colonies utilize a selection tree management system; (2) that the USFS thin vegetation within 1,200 meters of any colony to an optimal basal area of sixty square feet per acre while leaving old pines intact; (3) that the USFS begin a program to remove hardwoods in and adjacent to colony sites; and (4) that the agency eliminate or restrict the use of roads near colony sites. Beyond the 1,200 meter buffer zone, even-aged management could continue.

On August 19, 1988, the USFS presented a comprehensive timber management plan that deviated in several respects from the court's imposed restrictions. Instead of employing a selection harvesting system, the USFS offered an even-aged "modified shelterwood" plan, by which it would leave a greater density of trees to serve as reseeders and extend the rotational periods between cuttings to 120 years.

By an order entered October 21, 1988, the district court rejected the modified shelterwood harvesting system as not being in the best interest of the endangered species because it would still fragment the habitat, reduce old pines, and have an insufficient impact upon the bird's population recovery. Nevertheless, the court, by this order, modified its injunction, approving some sections of the USFS's plan and rejecting others. It gave the USFS another sixty days to pre-

---

**2.** Section 7 of the ESA reads in pertinent part that "[e]ach Federal agency shall ... insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species...." 16 U.S.C. § 1536(a)(2).

ESA section 9 provides in part that "it is unlawful for any person subject to the jurisdiction of the United States to ... take any such species within the United States or the territorial sea of the United States." 16 U.S.C. § 1538(a)(1)(B).

The statutory meaning of "take" is "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Under the regulations, the word "harm" means "an act which actually kills or injures wildlife. Such an act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3 (1989).

**3.** The plaintiffs do not appeal the insect-related issues.

pare a second comprehensive plan with the additional caveat that, as to the sixty-square-foot/acre basal requirement, forty-square-foot/acre had to include old pines.[4] On October 27, 1988, the government filed its notice of appeal from the June 17 and October 11, 1988 orders.

The USFS filed a second plan on December 19, 1988; however, the district court has not ruled on the second plan, awaiting the outcome of this interlocutory appeal.

## Discussion

### Jurisdiction

■ At the outset, we must address a matter that the government raises for the first time on appeal: is the "notice and delay" requirement of the ESA jurisdictional or procedural in nature? If the former,

---

4. The district court in this order also granted in part and denied in part the government's earlier motion to modify its June 17 order.

5. Section 1540(g) provides in relevant part:
   "(1) Except as provided in paragraph (2) of this subsection any person may commence a civil suit on his own behalf—
   "(A) to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof; or
   "(B) to compel the Secretary to apply, pursuant to section 1535(g)(2)(B)(ii) of this title the prohibition set forth in or authorized pursuant to section 1533(d) or 1538(a)(1)(B) of this title with respect to the taking of any resident endangered species or threatened species within any State; or
   "(C) against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary.
   "The district courts shall have jurisdiction without regard to the amount in controversy or the citizenship of the parties to enforce any such provision or regulation, or to order the Secretary to perform such act or duty, as the case may be. In any civil suit commenced under subparagraph (B) the district court shall compel the Secretary to apply the prohibition sought if the court finds that the allegation that an emergency exists is supported by substantial evidence.
   "(2)(A) No action may be commenced under subparagraph (1)(A) of this section—

---

did the plaintiffs fulfill the requirement and, if not and if it is procedural in nature, did the government waive the requirement by not raising it earlier?

Congress has authorized the use of citizen suits "to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of" ESA or the regulations thereunder. 16 U.S.C. § 1540(g)(1)(A). However, at least sixty days before commencing such a suit, "written notice of the violation" must have been "given to" the Secretary of the Interior and "any alleged violator of any such provision or regulation." 16 U.S.C. § 1540(g)(2)(A)(i).[5]

"(i) prior to sixty days after written notice of the violation has been given to the Secretary and to any alleged violator of any such provision or regulation;
"(ii) if the Secretary has commenced action to impose a penalty pursuant to subsection (a) of this section; or
"(iii) if the United States has commenced and is diligently prosecuting a criminal action in a court of the United States or a State to redress a violation of any such provision or regulation.
"(B) No action may be commenced under subparagraph (1)(B) of this section—
"(i) prior to sixty days after written notice has been given to the Secretary setting forth the reasons why an emergency is thought to exist with respect to an endangered species or a threatened species in the State concerned; or
"(ii) if the Secretary has commenced and is diligently prosecuting action under section 1535(g)(2)(B)(ii) of this title to determine whether any such emergency exists.
"(C) No action may be commenced under subparagraph (1)(C) of this section prior to sixty days after written notice has been given to the Secretary except that such action may be brought immediately after such notification in the case of an action under this section respecting an emergency posing a significant risk to the well-being of any species of fish or wildlife or plants."

So far as concerns the government's jurisdictional argument in this respect, the government and appellees treat this suit as being one under section 1540(g)(1)(A) only and as being one concerning which the only relevant and disputed requirement of section 1540(g)(2) is the notice requirement of section 1540(g)(2)(A)(i).

The government argues that it may for the first time raise the matter of this notice and delay requirement on appeal because section 1540(g)(2)(A) defines the subject-matter jurisdiction of federal courts. *See Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982). The plaintiffs contend, on the other hand, that the section is procedural in nature and that the government waived it by not raising it before the district court.[6]

In a case involving a similar sixty-day notice and delay requirement of the Resource Conservation and Recovery Act of 1976 (RCRA), *Hallstrom v. Tillamook County,* 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989), the plaintiffs had failed to notify the state and the Environmental Protection Agency, as required by 42 U.S.C. § 6972(b)(1), sixty days before commencing the action. Because the government defendants had properly challenged the defect in the district court prior to trial, the issue of waiver never arose on appeal. The Supreme Court ordered dismissal of the case, stating "that the notice and 60–day delay requirements are mandatory conditions precedent to commencing suit under the RCRA citizen suit provision...." *Id.* 110 S.Ct. at 311. However, by so holding, the Court concluded that it "need not determine whether § 6972(b) is jurisdictional in the strict sense of the term." *Id.*

The government urges this Court to rule that the section 1540(g)(2)(A)(i) notice and delay provision is sufficiently jurisdictional that it may be raised for the first time on appeal and that the plaintiffs failed to satisfy its demands.[7]

However, in an analogous area similar belated claims of jurisdictional defect have been rejected. Thus, where a case which is not subject to removal has nevertheless been removed to federal district court, the district court's power to decide the case may not be attacked for the first time on appeal on the ground that the action was not subject to removal, so long as it was one over which the district court would have had original jurisdiction had the case been filed there initially. *See Grubbs v. General Electric Credit Corporation,* 405 U.S. 699, 92 S.Ct. 1344, 1347, 31 L.Ed.2d 612 (1972). Consequently, in *Lirette v. NL Sperry Sun, Inc.,* 820 F.2d 116 (5th Cir. 1987) (en banc), we held that the plaintiff could not raise for the first time on appeal the contention that his state court Jones Act suit had been removed contrary to the provision of 28 U.S.C. § 1445(a) that such suits "may not be removed to any district court of the United States." Certainly, the quoted language of section 1445(a) is no less mandatory than the "[n]o action may be commenced" wording of section 1540(g)(2)(A) (see note 5, *supra*). Indeed, a restriction on the type or subject matter of case which may be removed would seem more nearly jurisdictional in nature than a

---

**6.** The plaintiffs maintain alternatively that the mandate of section 1540(g)(2)(A)(i) has been satisfied.

**7.** On November 4, 1987, more than sixty days prior to the January 18, 1988 amended complaint of the Sierra Club and Wilderness Society, the TCONR sent letters to the Secretary of the Interior and to the United States Attorney then representing the USFS in this litigation informing them of the suit the TCONR had filed in April 1985, as well as of its amended complaint of October 22, 1987, introducing the ESA claims respecting practices in addition to the beetle-control cutting. On January 12, 1988, the Sierra Club and Wilderness Society mailed similar letters of notice of their intent to amend their complaint to the Secretaries of Agriculture and the Interior, as well as to the Director of the USFWS and the Chief of the USFS.

With regard to the TCONR, the government complains that the November 4, 1987 letters fail

to satisfy the notice requirement of 16 U.S.C. § 1540(g)(2)(A)(i) because they were mailed *after* the ESA claims were filed (in April 1985 and October 1987) and because the letter for the USFS was mailed to the United States Attorney rather than to the chief of the USFS, the "alleged violator." The government also maintains that the November 4, 1987 TCONR letters do not satisfy the statutory notice requirement as to the Sierra Club and Wilderness Society because *they* did not independently provide the defendants with notice at least sixty days before their January 1988 filing. The government also asserts that both amended complaints relate back to the April 1985 original complaint, or that at the least the January 1988 amended complaint of the Sierra Club and Wilderness Society relates back to the October 1987 amended complaint of the TCONR.

requirement that notice be given for a specified time prior to suit.

The government asserts in its supplemental brief that questions regarding whether the United States has waived sovereign immunity may be raised initially on appeal. *See Commonwealth of Massachusetts v. Departmental Grant Appeals Bd. of the U.S. Dep't of Health and Human Serv.,* 815 F.2d 778, 781 (1st Cir.1987); *Ramey Constr. Co. v. Apache Tribe of the Mescalero Reservation,* 673 F.2d 315, 318 (10th Cir.1982); *California v. Quechan Tribe of Indians,* 595 F.2d 1153, 1154 n. 1 (9th Cir.1979).

In *Patsy v. Bd. of Regents of the State of Fla.,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), the defendant failed to raise the Eleventh Amendment defense at trial or in its brief on rehearing en banc, but did argue that defense in its appellate brief to the panel and in its opposition to the petition for certiorari. The Supreme Court noted that " 'the Eleventh Amendment defense ... partakes of the nature of a jurisdictional bar' " but did not accord the defense all the trappings of subject matter jurisdiction, ruling that it need not raise the matter of the Eleventh Amendment *sua sponte. Id.* 102 S.Ct. at 2567 n. 19 (citing *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974)). The Court chose to address the issue raised in the lower courts and "vigorously pressed" before it—whether exhaustion of state administrative remedies is a prerequisite to a section 1983 action—rather than the Eleventh Amendment defense. *Id.* We find *Patsy* instructive in this situation and observe that the Eleventh Amendment is expressly couched in jurisdictional terms ("The judicial power of the United States shall not be construed to extend to...."), while section 1540(g)(2)(A) is not.

In the court of appeals' opinion in *Hallstrom, supra,* the Ninth Circuit had determined that the sixty-day notice requirement of the RCRA was jurisdictional rather than procedural because such an interpretation "serves better the underlying policy aims of encouraging non-judicial resolution of environmental conflicts." *Hallstrom v.*

*Tillamook County,* 844 F.2d 598, 600–01 (9th Cir.1987); *accord Walls v. Waste Resource Corp.,* 761 F.2d 311, 316 (6th Cir. 1985); *Garcia v. Cecos Int'l, Inc.,* 761 F.2d 76, 79 (1st Cir.1985). On the other hand, four other circuits have ruled that the notice and delay requirements in federal environmental statutes should be treated as procedural in nature. *See, e.g., Hempstead County & Nevada County Project v. EPA,* 700 F.2d 459, 463 (8th Cir.1983) (noting that the purpose of RCRA notice, which had not been given, had been satisfied in the case); *Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor,* 619 F.2d 231, 243 (3d Cir.1980) (construing identical provision of the Federal Water Pollution Control Act (FWPCA)), *cert. denied,* 449 U.S. 1096, 101 S.Ct. 893, 66 L.Ed.2d 824 (1981); *Natural Resources Defense Council v. Callaway,* 524 F.2d 79, 83–84 (2d Cir.1975) (FWPCA); *Natural Resources Defense Council v. Train,* 510 F.2d 692, 699–703 (D.C.Cir.1974); *see also Roosevelt Campobello Int'l Park v. EPA,* 711 F.2d 431, 434 n. 7 (1st Cir.1983) (without deciding whether Clean Water Act notice provision was jurisdictional or procedural, noting that courts have generally taken a functional approach to such notice provisions).

In a case involving the Federal Tort Claims Act (FTCA), we ruled that one of its provisions, 28 U.S.C. § 2675(a), which requires the plaintiff to submit an administrative claim to the appropriate agency and to await its denial in writing before filing suit, is jurisdictional in nature. *Reynolds v. United States,* 748 F.2d 291, 292 (5th Cir.1984). We there concluded that "suits against the government under the FTCA must be filed in strict compliance with its provisions." *Id.* However, *Reynolds* is not directly controlling here, and since then the Supreme Court has held that where Congress has waived sovereign immunity by authorizing suit against the government, and has also provided a specific time limit for the bringing of suit, strict and absolute compliance with the specified time limit is not considered as a condition to, or a part of, the waiver of sovereign immunity, and thus failure to comply with the time

limit may be excused under the same equitable tolling principles applicable in similar suits against private defendants. *Irwin v. Veterans Administration,* —— U.S. ——, 111 S.Ct. 453, 456–57, 112 L.Ed.2d 435 (1990). In light of *Irwin,* we decline to extend *Reynolds* to the present setting [8] and reject the government's arguments premised on a sovereign immunity theory.

We also observe that the prohibition of the introductory clause of section 1540(g)(2)(A) is equally applicable to the condition stated in clause (iii) thereof, that the United States not be "diligently prosecuting a criminal action" to redress "a" (presumably, the complained of) "violation" (see note 5, *supra*). The standard of "diligently" is not the kind of bright-line criteria normally associated with truly jurisdictional requirements; and the "diligently" formulation likewise suggests that fact-finding, generally a trial court function, may be necessary to determine whether or not the condition is met. This in turn suggests that the "diligently" formulation is a condition which must be raised in the trial court. As the introductory clause of section 1540(g)(2)(A) does not distinguish between any of its three conditions—specified in its clauses (i), (ii), and (iii)—the inference is that if any of those conditions is not jurisdictional, then none of them is.

Most of the cases which have considered notice and delay requirements of the kind here involved have done so in a context where the issue was raised in the district court, or that court dismissed the suit for noncompliance.[9] The cases have tended to frame the debate as simply a choice of whether the notice requirement is jurisdictional or nonmandatory. They have not, however, focused on the possibility of a third alternative, which is suggested by (and left open in) *Hallstrom,* namely that although "the notice and 60–day delay requirements are mandatory conditions precedent to commencing suit" which "a District Court may not disregard ... at its discretion," nevertheless they are not "jurisdictional in the strict sense of the term." *Id.* 110 S.Ct. at 311. Following analogy to the removal cases, we conclude that section 1540(g)(2)(A), though clearly mandatory, is not jurisdictional "in the strict sense of the term," and hence may not be availed of for the first time on appeal by an appellant seeking reversal of an adverse trial court judgment on that basis. Since the government never questioned compliance with section 1540(g)(2)(A)(i) below, it may not do so now.[10] We accordingly turn to the merits.

*Merits*

■ The government challenges the standard of review the district court employed in considering the section 9 claim as well as its rulings on the ESA claims. With regard to the section 9 claim, the court noted that the statistics demonstrat-

---

8. Unlike the FTCA with which *Reynolds* was concerned, the ESA citizen suit provision, section 1540(g)(1)(A), does not simply permit suits against the United States, but allows suits to be brought against "any person, including the United States...." Because the ESA encompasses more than just suits against the government, we do not treat it as we do statutes whose exclusive focus is a limited waiver of the United States' immunity. *See United States v. Michel,* 282 U.S. 656, 51 S.Ct. 284, 285, 75 L.Ed. 598 (1931). It would be anomalous to construe the identical provision as strictly jurisdictional when applied to the United States as a defendant, but not when applied to other defendants. Moreover, the FTCA contemplates suits against the government for monetary recovery, an area where sovereign immunity concerns are perhaps at their height, while the relevant ESA provision relates *only* to suits "to enjoin" those then "in violation of" ESA or its regulations. Section 1540(g)(1)(A).

9. One exception to this statement is *Train,* where the government was unsuccessful in raising for the first time on its appeal the plaintiff's failure to comply with the notice requirement. *Id.,* 510 F.2d at 699, 703. Another possible exception is *Garcia,* where the issue was apparently raised by the appellate court on its own motion, but there the plaintiffs were appealing the district court's denial of relief. *Id.,* 761 F.2d at 78. We also note that *Garcia* relies entirely on cases where the appellate court had *sustained* the district court's dismissal of the suit for noncompliance with the notice requirements. *Id.* at 80. *Garcia* does not address the possibility that "strict compliance with the notice provision," *id.,* may be mandated without necessarily holding that it is strictly jurisdictional.

10. We hence do not reach the question of whether appellees, or any of them, complied with section 1540(g)(2)(A)(i).

ed that the population of the RCW in the East Texas national forests was declining.[11] *Sierra Club*, 694 F.Supp. at 1271. The court blamed the decline on the USFS and concluded that its practices had resulted in a "taking," as defined in the relevant statutes and regulations, 16 U.S.C. § 1532(19) and 50 C.F.R. § 17.3. *Id.*

The government contends that the court should have used the arbitrary and capricious standard of review in considering the section 9 claim, as it did for the section 7 claim, rather than the de novo standard of review it actually employed.[12] However, as appellees point out, the government's trial attorney repeatedly invited the court to try the section 9 claim de novo. Moreover, the government did not attempt to alter or clarify its position regarding the appropriate standard of review for the section 9 claim in its post-trial brief. Because it is a "cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by [a] party," we are not inclined to rule in the government's favor when, as here, it articulated to the court that it sought review under the standard it now challenges.[13] *Crockett v. Uniroyal, Inc.*, 772 F.2d 1524, 1530 n. 4 (11th Cir.1985).

The district court determined that the USFS's "practice of even-aged management ... resulted in significant habitat modification" and that its actions "have caused and accelerated the decline in the [RCW] species." *Sierra Club*, 694 F.Supp. 1260. It is undisputed that the population of RCWs in the East Texas national forests declined significantly from 1983–87. *See* note 6, *supra*. And it is also clear that the RCW population has not fallen as a result of permits granted under section 1539(a)(1).[14]

The government has admitted in its brief that it "did not completely implement the provisions" of its wildlife management handbook regarding the RCW prior to the release of the 1987 USFS report documenting the RCW's decline in population. The USFS's Forest Supervisor for Texas, Mike Lannan, admitted this at trial, stating that the USFS had permitted clearcutting within two hundred feet of RCW cavity trees. The government also does not dispute that it did not remove midstory hardwood, as required by the handbook, thus leading to RCW abandonment of cavity trees. Such a course of conduct certainly impairs the RCW's "essential behavioral patterns, including ... sheltering," 50 C.F.R. § 17.3, and thus results in a violation of section 9.[15] *See* note 2, *supra*. Because the dic-

11. The number of RCW colonies in the Davy Crockett National Forest had declined from forty-six colonies in 1983 to twenty-seven in 1987. In the same time period, the number of colonies at the Angelina National Forest declined from thirty-eight to twenty-two colonies. At the Sabine National Forest, the population fell from twenty-five colonies to just seven colonies between 1983 and 1987. The statistics for the Sam Houston National Forest were not ready at trial. *Sierra Club*, 694 F.Supp. at 1271.

12. The government concedes that de novo review was proper to the extent such review was limited to considering whether the USFS's failure to remove hardwood midstory, as required by its own handbook, caused the decline in the RCW population. In discussing the section 9 claim, the court cited failure to remove hardwood midstory as one of the reasons for the decline of the RCW population. *Id.*

13. We note that review of the section 9 claim, unlike the section 7 claim, does not involve an examination of the consultation process between the USFS and the USFWS. As the government asserts in its reply brief, in any

event, de novo review appears appropriate "when the expertise of the Fish and Wildlife Service is not brought to bear...."

14. Under 16 U.S.C. § 1539(a)(1)(A), the Secretary of the Interior may permit an act that otherwise would violate section 9 if it is done "for scientific purposes or to enhance the propagation or survival of the affected species...." Pursuant to section 1539(a)(1)(B), the Secretary may also authorize a taking that, otherwise prohibited by section 9, "is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity."

15. The Sierra Club and Wilderness Society also introduced at trial as plaintiff's exhibit 30 a "Chronology of Events Concerning Red-cockaded Woodpecker Colony 102–1, Sabine National Forest." It represents that USFS employee Larry Bonner was aware of the cutting of RCW cavity trees, purportedly to stem the infestation of southern pine beetles. We need not consider the veracity or admissibility of this exhibit, however, as the matters discussed in text preceding this footnote suffice to state a section 9 violation.

tates of the USFS's handbook were intended to preserve the dwindling RCW population, it is not unreasonable to conclude that failure to observe the handbook would result in a "taking" of the RCW. We therefore conclude that the district court did not err in finding that the government violated ESA section 9.

The government also complains on appeal about the district court's finding, arrived at under an arbitrary and capricious standard of review, that the USFS violated ESA section 7 by not taking the steps necessary to ensure that its conduct did "not jeopardize the continued existence of the woodpecker...." *Sierra Club*, 694 F.Supp. at 1272. The record indicates that since 1979 the USFS has consulted with the USFWS regarding the fate of the RCW at least three times. Following the release of the 1987 USFS report chronicling the decline in the RCW population, the USFS prepared a management strategy to contend with the problem. It called for, among other things, the control of hardwood midstory encroachment and the use of the shelterwood or seed tree regeneration methods rather than the clearcutting method within 1200 meters of RCW colonies. The USFWS reviewed the strategy and 1987 report and concluded generally that further consultation was not necessary. In a February 16, 1988 letter to the USFS (defendant's exhibit 49), the USFWS stressed the importance of the regeneration methods chosen by the USFS and stressed that shelter and seed trees should be allowed to grow to at least one hundred years old. In the letter the USFWS requested that the USFS provide it with periodic reports on its efforts to save the RCW. The USFS was in the process of preparing the final version of its RCW management strategy when the district court entered its injunction and ordered the USFS to implement its management plan, having the parameters specified by the court.

■ The district court correctly employed the arbitrary and capricious standard in considering the section 7 claim. *See Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir.1983); *Tribal Village of Akutan v. Hodel*, 859 F.2d 651, 659 (9th Cir.1988). Under section 7, once it had consulted with the USFWS, the USFS had to determine whether its silvicultural practices were "likely to jeopardize the continued existence of" the RCW "or result in the destruction or adverse modification" of its habitat. 16 U.S.C. § 1536(a)(2); *see National Wildlife Fed'n v. Coleman*, 529 F.2d 359, 371 & n. 18 (5th Cir.1976). At that point, on judicial review, a court must determine whether " 'the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " *Coleman*, 529 F.2d at 372 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971)). For the reasons stated with regard to the section 9 claim, we cannot conclude that the court erred in determining that the USFS's actions were "likely to jeopardize the continued existence" of the RCW in violation of ESA section 7.[16]

■ Clearly, the district court has the authority to enjoin an agency from violating section 7 of the ESA. 16 U.S.C. § 1540(g)(1)(A). As part of that authority, the court may enjoin the agency from continuing activity that has resulted in past violations and, to the extent necessary, may dictate temporarily the actions the agency must take with regard to that activity until the party has submitted to the court an acceptable plan of its own. *See, e.g., Coleman*, 529 F.2d at 375. Once an agency submits a plan that has been agreed to through the section 7 consultation process, the court then, applying the arbitrary and capricious standard of re-

---

**16.** We note the concern that a finding of a single section 9 taking should not necessarily result in section 7 liability. In this case, however, it is clear that much more than one taking occurred, and the continued existence of RCWs in the East Texas national forests was in jeopardy at least in material part because of the USFS's actions. In any event, the government may effect a legal taking if it procures a "take" permit pursuant to section 1539(a)(1), *see* note 14, *supra,* and thus avoid implicating section 7 (so long as the government is not taking other actions that result in a section 7 violation).

view, must approve or disapprove it. If the latter, the court should send the consulting parties back to the drawing board to compose a plan that, when given the benefit of the arbitrary and capricious standard of review, provides reasonable assurance against continuation of the section 7 violations. *See Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

■ Here, the district court, within its statutory authority, enjoined the government from violating section 7 and granted the USFS sixty days to consult with the USFWS to devise an appropriate plan. However, the court's injunction in essence fashioned the plan, dictating the principal feature of all significant steps the USFS must take with regard to the RCW. *See Sierra Club*, 694 F.Supp. at 1278. The injunction left little room for the congressionally-mandated consultation process (or for USFWS action under section 1539(a)(1)) to have any say in the RCW's future, as evidenced by the court's October 20, 1988 order, which rejects most of the USFS's alternative plan. *Cf. Coleman, supra,* (in granting injunctive relief under ESA, Court enjoined certain actions *until* the agency, through the consultation process, composed a plan that provided adequate assurance against future violation of section 7). The court's injunction eviscerated the consultation process by effectively dictating the results of that process. Thus, the court exceeded its authority to enjoin violations of the ESA.

### Conclusion

Accordingly, the district court's complained of orders are affirmed to the extent that they prohibit or condition action by defendants *pending* their formulation, following any appropriate consultation with USFWS, of a proper timber management plan for the national forests of Texas that adequately addresses the effects of defendants' contemplated actions on the RCW habitat and its continued survivability, and presentation of such plan to the district court and its approval of same. However, so far as the district court's orders mandate in advance the specific features such a

plan must contain, the said orders are vacated. The cause is remanded to the district court to review the USFS's current plan, applying the arbitrary and capricious standard, for compliance with the ESA in reference to the RCW and its habitat. The review shall be of the plan, and its effects on the RCW and its habitat, as a whole, and not for compliance, *per se*, with the district court's previous directions as to the specific features such a plan must contain. If the agency produces a plan that is legally sufficient, when reviewed under the arbitrary and capricious standard, the district court is not to substitute its judgment for that of the agency as to which particular features might be most desirable or efficacious.

AFFIRMED in part; VACATED in part; cause REMANDED.